WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sharon Garnes, | No. CV-19-03199-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendant. | |

Before the Court is Defendant City of Phoenix's (the "City") Motion to Enforce Settlement Agreement (the "Motion") (Doc. 77). The Court held an evidentiary hearing and arguments related to the Motion. (Doc. 89.) For the following reasons, the Motion will be granted.

**I.   BACKGROUND**

The City and Plaintiff Sharon Garnes participated in a settlement conference before Magistrate Judge Camille D. Bibles on January 7, 2021. (Doc. 74.) The City offered Ms. Garnes a $500 check and to clear her Public Housing account balance of $401.82 in exchange for dismissing the case. (Doc. 77-3 at 10.) Settlement was not reached.

Shortly thereafter, on January 24, 2021, Ms. Garnes contacted the City's counsel by email to say, "if the offer is still there I will take it and settle." (*Id.* at 11.) The City's counsel responded the next day informing Ms. Garnes that the previous settlement offer was still open. (*Id.* at 10.) Defense counsel also noted that she was attaching a settlement

agreement and stipulation for dismissal for Ms. Garnes' review and would mail a hard copy of these documents to her as well. (*Id.*) Ms. Garnes replied later that day and said, "I think I signed it" but she did not know if she "signed it right." (*Id.* at 9.) She also asked for two hard copies and mentioned she would "sign it if it didn't go through." (*Id.*) The City's counsel responded to Ms. Garnes to let her know that she did not receive her signature but could "re-send the documents . . . via email for an electronic signature using Adobe." (*Id.* at 8.)

The next day, defense counsel emailed Ms. Garnes to let her know that she would be receiving documents that could be signed using a "phone or any computer" and detailed the multiple steps involved to sign the documents. (*Id.* at 7.) Ms. Garnes responded quickly, "when you send it I'll sign it." (*Id.*) The settlement agreement was sent to Ms. Garnes shortly thereafter. (Doc. 91, Ex. 61.) An Adobe "Final Audit Report" shows that someone from Ms. Garnes' email "e-signed" the settlement agreement at 11:03 AM MST. (*Id.*) The City then emailed Ms. Garnes to alert her that the City's finance department also requires her to "complete a W-9 in order to write [her] a check." (Doc. 77-3 at 5–6.) Ms. Garnes expressed her concern about taxes being taken out of her settlement check and stated, if that happened, she would "cancel the other paper [she] signed." (*Id.* at 5.) Defense counsel assured Ms. Garnes that this was standard procedure, no taxes would be taken out, and she would send a copy in the mail. (*Id.* at 3–4.) Ms. Garnes then sent a chain of emails indicating that she would not sign the tax document and she would now "only settle for no less than $5,000." (*Id.* at 1–3.) Ms. Garnes also alleged that the City intimidated and forced her to sign the settlement.[1] (*Id.*) For the first time on January 29, she also mentioned that the signed settlement agreement was not her signature and her friend "did it on his [phone]." (Doc. 88-1 at 1.) The City then filed the instant Motion two weeks later. (Doc. 77.)

The Court conducted a status conference to better understand the signature issue and ultimately set an evidentiary hearing to determine the signed settlement agreement's

---

[1] Ms. Garnes reiterated these points at the evidentiary hearing. (*See, e.g.*, Doc. 97 at 13, 17.)

validity. (Doc. 87.) The Court then held the evidentiary hearing. (Doc. 89.) At the hearing, the Court heard arguments by both parties and testimony from two witnesses— Ms. Garnes and Kevin Banton. (Doc. 97 at 2.) The relevant testimony for those two witnesses is as follows.

Ms. Garnes agreed that the communications outlined above were true, "except for the signing of the document." (*Id.* at 12.) She also clarified that she kept asking for hard copies because she had never read the settlement agreement until February 20. (*Id.* at 12, 16, 33.) As to the day the document was signed, Ms. Garnes testified that Mr. Banton, her "friend" and "mother's yard man," was "doing the yard" at her mother's house. (*Id.* at 44–45.) She noted that Mr. Banton left his phone on the porch and she "got it" to read and sign the settlement document. (*Id.* at 43–46.) Ms. Garnes then unlocked his phone and logged into her Gmail account to pull up the settlement agreement. (*Id.* at 43–44.) She tried to "blow it up" so she could read and sign the agreement. (*Id.* at 45.) She also "had it up ready to sign" and "was in the process of signing it." (*Id.* at 62.) While doing this, Ms. Garnes testified that Mr. Banton saw her with his phone and "came running over . . . to get his phone." (*Id.*) She stated that "[h]e asked me what I was doing and I told him I was trying to read this because I'm trying to settle this with the City." (*Id.* at 45.) Ms. Garnes testified that he tried to "help" her, but she said, "[d]on't do that." (*Id.* at 46.) At that point, Ms. Garnes noted that she "had no idea [the signature] went through." (*Id.*) What appears to be a signature was applied and transmitted through the Adobe software. (Doc. 91, Ex. 61 at 3.)

By: _____
SHARON GARNES (Jan 26, 2021 11:03 MST)
Sharon Garnes

Mr. Banton then recounted his version of the events. He testified that he saw Ms. Garnes with his phone so he "snatched the phone and started . . . erasing whatever [she] was doing." (Doc. 97 at 51.) Mr. Banton testified that he began "clicking" and "swiping"

1   whatever was on the phone to get it off because he did not "want it on [his] phone." (*Id.*
2   at 53–55.) He reiterated several times that he did not put a signature on the document. (*Id.*
3   at 55.) As to the Adobe steps necessary to complete the signature on the phone, Mr.
4   Banton did not recall seeing any prompts or buttons on his screen and did not take any
5   steps himself to complete the signature process. (*Id.* at 54–56.) After the document was
6   off his screen, Mr. Banton "put the phone in [his] pocket and kept doing what [he] was
7   doing." (*Id.* at 56.) He also noted that he had no intention of helping Ms. Garnes sign the
8   document. (*Id.*) After reviewing the signed settlement agreement at the hearing, Mr.
9   Banton testified that it was possible, although he did not pay "attention to it," that his
10  multiple swipes to get the document off his phone could have generated the signature.
11  (*Id.* at 59–61.) Specifically, Mr. Banton noted that the signature "looks like a swipe" to
12  him. (*Id.* at 60–61.)

## II.   LEGAL STANDARD

The Court has inherent authority to enforce settlement agreements. *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994). The district court may, however, "enforce only complete settlement agreements. Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).

State contract law governs whether the parties reached an enforceable agreement.[2] *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014). Under Arizona law, "for an enforceable contract to exist[,] there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Savoca Masonry Co. v. Homes & Son Const. Co.*, 112 Ariz. 392, 394 (1975). "The very existence of the contract itself, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined in case of doubt, not only from the words used, but also from the situation, acts and conduct of the parties, and from the attendant circumstances." *Malcoff v. Coyier*, 14 Ariz. App. 524, 526 (1971). The party

---

[2] The parties both agree that Arizona law applies to this dispute. (*See* Doc. 97 at 6–7.)

1 seeking enforcement of the contract has the burden of proving its existence. *Slater v.*
2 *Arizona*, 2019 WL 5801981, at *3 (D. Ariz. Nov. 7, 2019).

## III.   DISCUSSION

At issue is whether the parties entered into an enforceable settlement agreement. The City argues that Ms. Garnes' signing of the settlement agreement, and her accompanying conduct, make clear that she accepted the City's settlement offer. (Doc. 77.) First, there is what appears to be Ms. Garnes' signature on the settlement agreement. Second, Ms. Garnes' emails, the City contends, "clearly indicate that she represented to the City that she had signed the document" and intended to be bound by the agreement. (Doc. 97 at 63–64.) The City also argues that Ms. Garnes has not, and cannot, overcome the presumption that her electronic signature is valid. (Doc. 81 at 3–4; Doc. 97 at 63–64.) Ms. Garnes maintains that she did not sign the agreement, nor did she read the agreement until weeks after the electronic signature was submitted. (Doc. 97 at 13, 24, 33.) As mentioned above, the settlement agreement at issue is governed by Arizona contract law, which requires, at a minimum, an offer, an acceptance, consideration, and adequate specification of terms so that obligations can be ascertained to have an enforceable contract. *Rogus v. Lords*, 166 Ariz. 600, 602 (App. 1991). The Court will therefore address each argument in turn.

### A.   Enforceable Agreement

There is no question that there was an offer by the City to settle. In response to Ms. Garnes asking if the previous offer "is still there," the City indicated that the offer was still open and that it was "still willing to settle for those terms." (Doc. 77-3 at 10–11.) The City also attached a settlement agreement document and stipulation for dismissal on that email for her review. (*Id.* at 10.) This settlement agreement laid out the consideration involved and contained adequate specification of terms. (Doc. 77-1 at 1–3.) The agreement clearly identified the "Settlement Consideration," which noted that Ms. Garnes would voluntarily dismiss this action with prejudice and the City would issue her a $500 check and clear her housing balance of $401.82. (*Id.* at 1–2.) Looking at the

agreement, the Court is satisfied that the settlement agreement contains specified terms so that the obligations involved can be ascertained. (*Id.* at 1–3.) Whether Ms. Garnes accepted the offer is the only element at issue.

"Under general contract principles, an acceptance must be unequivocal and on virtually the exact same terms as the offer." *Contreras v. Contreras*, No. 2 CA-CV 2018-0145, 2019 WL 3285230, at *3 (Ariz. App. July 22, 2019) (citation omitted). The City contends that Ms. Garnes' accepted its renewed offer to settle the case by her conduct and signing of the electronic document. (Doc. 77 at 1–2; Doc. 81 at 2–4; *see also* Doc. 97 at 42–46, 63–64.) Ms. Garnes maintains that she did not sign the document and did not even read it until weeks after the electronic signature was processed. (Doc. 97 at 65–67.) The Court agrees with the City that Ms. Garnes validly entered into the settlement agreement.

The most important fact is that there is a signature on the settlement agreement above the printed name "Sharon Garnes." Beyond this, Ms. Garnes' statements and conduct confirm that she signed it. Ms. Garnes was the party who initially reached out to the City to accept its previous offer and "settle" the case. (Doc. 77-3 at 11.) After being sent the settlement agreement and an email with terms listed explicitly, she told the City that she thought she "signed it." (*Id.* at 9–10.) Although that signature did not go through to the City at that time, Ms. Garnes continued to state that she would sign the agreement when the Adobe settlement version was sent to her. (*Id.* at 7.) Ms. Garnes admitted that she was "in the process" of signing the settlement agreement the day that the Adobe report recorded her signature. (Doc. 97 at 66.) She also said, later on, that she in fact signed the settlement agreement but wished to "cancel" it and obtain more money. (*Id.* at 66–67; Doc. 77-3 at 5.) The Court therefore finds that the marking on the settlement agreement is a signature and that the signature was hers.[3]

---

[3] The City contends that "A.R.S. § 44-7033(B) provides that there is a rebuttable presumption that an electronic signature is the electronic signature of the party to whom it relates." (Doc. 81 at 3.) Ms. Garnes does not rebut this argument at any point. Under the Arizona Electronic Transactions Act, "[a] record or signature in electronic form cannot be denied legal effect and enforceability solely because the record or signature is in electronic form," A.R.S. § 44-7007(A), and there is a rebuttable presumption that the settlement agreement's signature is Ms. Garnes' signature. A.R.S. § 44-7033(B). Ms. Garnes has failed to overcome this presumption. Even if this presumption did not exist,

1 As mentioned above, Ms. Garnes testified that she had pulled up the signature box, a step required through the Adobe process. She then said she was signing the agreement until Mr. Banton came over. Mr. Banton testified that he was "swiping" the screen to get the document off his phone, but when asked to evaluate the signature, he tried to dismiss the signature as a product of his "swiping." (Doc. 97 at 59–61.) He also testified that he did not even know what was on the screen to begin with. Simply "swiping" or "clicking" things off his phone could not have produced a somewhat distinctive signature like the one that the agreement shows. (Doc. 80 at 10.) The marking that populated from the Adobe software is clearly a signature, not a swipe. There were also inconsistencies between his and Mr. Garnes' testimony. For example, Ms. Garnes noted that Mr. Banton was "helping" her with the process while he maintained he did no such thing. (Doc. 97 at 46, 56.) The Court does not find Mr. Banton's testimony credible.

The argument that Ms. Garnes' did not read the agreement, and should therefore be excused, is also unpersuasive. First, there is ample evidence to show that she did in fact read the settlement. At the evidentiary hearing, Ms. Garnes noted several times that she was reading the settlement document before the electronic signature populated. (*See* Doc. 97 at 62.) She also implied in her emails that she had read the paperwork at issue. (*See, e.g.*, Doc. 77-3 at 2 (noting that Ms. Garnes was "going to read that papwork [sic] *again*") (emphasis added).) Second, even if she did not read the agreement, Ms. Garnes would nonetheless be bound by the settlement's terms. *See Emp. Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996) ("A party who signs a written agreement is bound by its terms, even though the party neither reads the agreement nor considers the legal consequences of signing it."). The parties' actions, emails, and testimony show that there was an enforceable settlement agreement between the two.

It appears to the Court that, at some point after signing the agreement, Ms. Garnes changed her mind. The law does not allow someone to undo an enforceable agreement merely because she had a change of heart. *See United Cal. Bank v. Prudential Ins. Co. of*

---

the record is full of evidence to show that Ms. Garnes signed the document at issue.

1 *Am.*, 140 Ariz. 238, 277 (App. 1983). For these reasons, the City has met its burden and the settlement agreement will be enforced.

### B. Ms. Garnes' Defenses to Enforcement

Ms. Garnes mentions several times that she was intimidated by the City's actions and under duress during the time the settlement agreement was signed. (Doc. 80 at 2–3; Doc. 97 at 36, 38.) Specifically, Ms. Garnes points to the City's attempt to extend deadlines as the reason that she thinks the city violated A.R.S. § 13-412. (*Id.*) The City contends that § 13-412 does not apply because that statute provides a "defense to culpability for a criminal act." (Doc. 81 at 2.) The Court agrees with the City that § 13-412 does not fit in this context. This statute applies only in the criminal context, not a civil dispute. The Court also does not see how the City asking for an extension for deadlines would intimidate Ms. Garnes or cause her duress.

Although Ms. Garnes is not clear on what other grounds would require this Court to not enforce her signature, she does mention that she had mental and medication issues. (Doc. 97 at 32, 36.) Ms. Garnes, however, does not elaborate on how this impaired her ability to understand the settlement agreement. She also does not argue or provide evidence that these issues were present when she signed or read the settlement agreement. For these reasons, Ms. Garnes' arguments related to duress or incapacity are not persuasive.

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED** granting the City's Motion to Enforce Settlement Agreement (Doc. 77).

**IT IS FURTHER ORDERED** denying as moot Ms. Garnes' Motion for Summary Judgment (Doc. 84).

**IT IS FINALLY ORDERED** directing the parties to abide by the Settlement Agreement (Doc. 77-1). Ms. Garnes must comply with the terms of the settlement agreement, including signing the stipulation for dismissal to receive her consideration no

later than May 11, 2021. The City shall disperse a $500 check to Ms. Garnes and clear her housing account balance of $401.82 within 48 hours of receiving the signed stipulation. The City must then file the signed stipulation for dismissal.

Dated this 3rd day of May, 2021.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge